UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CHADRICK B PATE, | § | |
| | § | |
| Petitioner, | § | |
| VS. | § | CIVIL ACTION NO. 4:13-CV-709 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER

This case is before the Court on Petitioner Chadrick B. Pate's Petition for Writ of Habeas Corpus, Respondent's Motion for Summary Judgment, and Pate's Cross-Motion for Summary Judgment. Having carefully considered the Petition, the motions, and the arguments and authorities submitted by the parties, the Court is of the opinion that Respondent's Motion for Summary Judgment should be GRANTED, Pate's Cross-Motion for Summary Judgment should be DENIED, and Pate's Petition for Writ of Habeas Corpus should be DENIED.

I.     Background

Pate was convicted of murder under the law of parties in the 36th Judicial District Court of Aransas County, Texas, and was sentenced to 99 years imprisonment. Texas' Thirteenth Court of Appeals described the factual background of the case.

> On June 24, 2008, an Aransas County grand jury indicted Pate, [Christopher Joseph] Hall, Michael Jason Underwood, Anthony Lee Ray, and Kevin Ray Tanton on counts of murder and engaging in organized criminal activity. . .The murder count of the indictment alleged that those individuals, "acting alone and together," intentionally or knowingly caused the death of Aaron Watson on or about January 4, 2008 by shooting Watson with a firearm. After

making initial statements to police, Underwood, Ray, and Tanton entered into agreements with the State whereby they would provide testimony against Pate and Hall in exchange for recommended sentences of fifteen years' imprisonment or less. Pate and Hall were then tried together before a jury over four days in February 2009. At trial, the State called twenty-one witnesses to testify against the defendants, after which the defendants rested without calling any witnesses. Pate and Hall were subsequently found guilty of murder, sentenced to ninety-nine years in the Institutional Division of the Texas Department of Criminal Justice, and ordered to pay $10,000 fines. . .

II. The Evidence

A. Michael Huffman

Deputy Michael Huffman of the Aransas County Sheriff's Office testified that in the early morning hours of January 4, 2008, he was dispatched to a trailer residence in Fulton, Texas, to respond to a disturbance in progress. He arrived to find a "distraught" and "screaming" young female "standing in the roadway." The girl told Deputy Huffman that "[m]y daddy's been shot" and pointed to the backyard of an adjacent residence, where the girl's father, Aaron, lay on his side, drifting in and out of consciousness. Deputy Huffman observed gunshot wounds on Aaron's lower left abdomen and left leg. Aaron was evacuated via helicopter to Christus Spohn Memorial Hospital in Corpus Christi, where he later died of his injuries.

B. Michael Brooks

Michael Brooks, an investigator with the Aransas County Sheriff's Office, testified that he was also dispatched to the Watsons' trailer in Fulton on the early morning of January 4, 2008. Investigator Brooks stated that he had met the victim before and that "Tracy Watson, [J.W.], [M.W.], Chadrick Pate, [and] Aaron Watson" lived in the trailer "at one time or another." FN4 He then identified several photographs . . . depicting what he observed when he arrived at the scene. Investigator Brooks testified that, "just into the doorway" of the trailer, he found and collected "two unspent

shell casings" and "one spent shell casing" for a .38–caliber firearm. He also recovered a "light blue jean, long-sleeve shirt that ... belonged to the victim" and a wristwatch from the adjacent backyard, as well as a baseball bat from the front of the Watsons' trailer, and paperwork from inside the trailer. According to Investigator Brooks, the blue shirt had a "bullet hole" and a "small amount of blood" which was later determined to belong to the victim.

FN4. The evidence established that Tracy was Aaron's wife and that J .W. and M.W. are the couple's teenage daughters. To protect the children's identities, we refer to them by their initials. See Tex.R.App. P. 9.8.

Investigator Brooks spoke with Tracy "later that morning." According to Investigator Brooks, Tracy "gave us some information on some subjects.... She said a couple of people had came down to take care of a guy named J.R. or help Chad take care of a guy named J.R. and she gave some name of Ziggy (ph) and a Thunderwood (ph)." Using this information, as well as other information obtained from police in Houston, Investigator Brooks determined that "Thunderwood" referred to Michael Underwood.FN6 Photo arrays were then presented to J.W. and M.W.; the girls identified Underwood as being present at the crime scene and Underwood was then arrested. Underwood gave a statement to police which led to Pate, Hall, Ray and Tanton being identified as suspects in the case.  Ray and Tanton were arrested and interviewed by police, and their stories regarding what happened on the night in question were consistent with Underwood's. Tanton also provided information that led to the recovery of a weapon from the bottom of Copano Bay by a police dive team . . .

FN6. Investigator Brooks further testified that "Ziggy" referred to Christopher Hall.


On re-direct examination, Investigator Brooks stated that Hall, Pate, and Underwood are members of a prison gang called the Aryan Circle, and that he believed Ray and Tanton are prospective members of that gang. . . Finally, Investigator Brooks stated that he presented photo arrays to J.W. and M.W. and both girls identified Hall as having been present at the crime scene.

* * *

D. Kevin Tanton

Tanton stated that he met Underwood while serving time in the Liberty County Jail. Underwood was also "involved with Aryan Circle," which Tanton described as "a cross between a militia group and a prison gang I guess." Tanton stated that he met Hall at a Christmas party in 2007. In January of 2008, Hall drove Tanton and Underwood to Fulton, Texas, so that the men could help an Aryan Circle member named "Sid" remove several members of a rival gang from his house. Tanton stated that Hall had an "oldish revolver" with him at the time and that Hall had expressed the desire to obtain more firearms in order to confront the rival gang members. According to Tanton, the group then met up with Ray and "Sid." Tanton then identified Pate in the courtroom as the gang member he knew as "Sid." Tanton stated that Pate then told Underwood and Hall how to approach the house where the rival gang members were without being seen. According to Tanton, Pate represented that the house belonged to him. The group then traveled to the house and gathered at a small shed nearby. According to Tanton, Pate "started acting really sketchy at this point. He said he was going to pull phone lines. And when we all took off to go to the house, [Pate] ran around the house and I didn't see him again, really...." Tanton stated that "[e]verybody had a weapon at that point" and that Hall in particular was carrying his revolver. Tanton identified the revolver pulled from Copano Bay as the one carried by Hall on the night in question.

Tanton testified that he, Hall, Underwood, and Ray then approached the house. When they entered, Tanton observed "a female standing in front of the door" and a man "laying on the bed" next to the door. Tanton and Underwood ushered the girl into a room and shut the door; they then returned to see Hall and Ray "standing over the guy [in the bed]. Hall had the gun pointed at him, like, toward his face." Tanton stated that Ray "was hitting the man in the bed with whatever he had in his hands, stick, pole type object thing." Tanton himself hit the man "when he was crawling away" with a pipe segment he had found in front of the trailer. Tanton continued:

> As the guy was, like, turning to face off and squirming away, like, trying—he was, like, trying to get up to get out the door I guess. Hall—I mean, Hall shot him. I mean, actually didn't see the shot, but, you know, he had the gun in his hand.... And then I see the guy get up and, I mean, I could actually see the wound, the puncture.

According to Tanton, the group drove away without Pate after the shooting, and as their vehicle passed over a bridge,

> Hall handed me the firearm and told me to throw it out the window.... And then he told me to take off my sock.... So I opened it up like this and [Hall] reached in his coat pocket and he pulled out the bullets and he put the bullets in my sock and then he told me to throw my sock with the bullets out the window, too.

Tanton stated that he had since pleaded guilty to aggravated assault for his participation in the events of January 4, 2008. He denied that he had been made any deal or agreement with the State in exchange for his original statement to police.

\* \* \*

E. Michael Underwood

Underwood stated that he was a member of the Aryan Circle . . . Underwood testified that he traveled with Hall, then his roommate, from Houston to the Watsons' trailer in November of 2007. The two made the trip because "[s]upposedly [Pate's] old lady got almost raped or something like that .... [we came down t]o go find the guy who tried to do it." Underwood stated that both he and Hall carried .38–caliber handguns at the time. The two met up with Ray and continued to the Watsons' trailer, where they met Tracy, J.W., and M.W.  The group "dr [ove] all over [Fulton] ... on a wild goose chase" but could not locate the man they suspected of attempting to rape Tracy.

Several weeks later, on January 4, 2008, Underwood returned to Fulton because "[s]upposedly somebody was at Pate's house holding his kids and his old lady hostage or something." On his way, Underwood picked up Tanton "[j]ust to have somebody extra come with us .... [bec]ause there was supposed to be more than—more than two guys at that trailer." According to Underwood, Hall was carrying the revolver that was later pulled out of Copano Bay. Underwood rode with Pate and Ray to what he believed was Pate's trailer. Pate was giving the group directions on how to get into the trailer. When the group stopped at a shed near the trailer, Pate "[s]aid he wanted the dude there ran off." Pate then "went to the side of the house, not the trailer, and did something. Then he

started walking, like, towards the woods." Underwood then
approached the trailer, at which point the door was opened by a
young girl. Underwood testified that he saw an unarmed man,
whom he did not recognize, laying on a bed next to the door in the
trailer. He and Tanton took the girl to a room in the trailer and shut
the door. When Underwood returned, "everybody was running out
the door" and a "muffled" gunshot could be heard. Underwood
then saw Hall "[h]olding [a gun] in his hand, running." The group
then drove off, with Tanton throwing a gun and a sock containing
bullets off of the Copano Bay bridge. On their way back to
Houston, Hall "said he shot him [be]cause he kept looking at him"
and "[h]e said he tried to shoot him again and the gun jammed or
something."

Underwood, like Tanton, pleaded guilty to aggravated assault for
his participation in Aaron's killing and denied that he was
promised anything by the State in exchange for his initial statement
to police.

\* \* \*

F. Anthony Ray

Ray stated that he was recruited to become a member of the Aryan
Circle while serving time in the Aransas County Jail, and that he
met Pate in 2007. Ray stated that, within the gang, his nickname
was "Spooky." According to Ray, in November of 2007, Pate "had
called down Chris Hall and Underwood and they came down and I
guess we were going to—supposed to be going to fight with these
guys that were supposedly sexually assaulting his girlfriend."
However, all the group did was "[j]ust dr[i]ve around aimlessly"
for "several hours."

Ray testified that on January 4, 2008, Pate told him that "all these
guys are there at the trailer and they're sexually assaulting his
girlfriend and that we were going to go over there and run them
off, you know, and Scott is sending down these guys from
Houston." Ray stated that he visited [Justin] Padgett's house on
that day to pick up some methamphetamine. He and Pate then met
up with Underwood, Hall, and Tanton in Fulton. According to Ray,
Pate told the group that "we were going back to that trailer that we
had gone to before and he was just telling us, 'Hey, we're going to
go run these dudes off,' you know." When they arrived at the
trailer, Pate led the group to the shed near the trailer, then "went
back around" the trailer purportedly to cut the trailer's phone lines.
Ray stated that the group "snuck up to the door" and "the little girl

was right there at the door.... It was Underwood or Tanton that took the two little girls into another room and I guess to keep them out of danger, you know. And then it was just me and Chris Hall and whoever else." Ray saw a man he did not recognize on the bed near the door; he first realized that Hall had a gun when Hall sat down next to the man on the bed. Ray testified that Pate had told him that Aaron was the name of the person they were looking for. Hall asked the man on the bed to state his name; when the man did not comply, Hall "tapped him on the head with the gun." Ray "got impatient and ... punched [the man] in the face" two or three times with a closed fist. Ray continued:

> Then, well, Chris puts a gun to him. It looked to me like he put it under his leg at the time. I thought he had put it under his leg. I guess not. But, anyway, he puts the gun up to him and he puts a pillow on it and then, you know, 'pop,' you know, 'bang,' you know. Didn't really sound that loud but ... I knew that the gun had discharged. I didn't think he was hit. I mean, just the way he just got up and just ran like that, you know, perfectly capable.

The group then ran out of the house and departed in their vehicles, with the exception of Pate, who "had disappeared."

* * *

G. J.W.

J.W. testified that she is thirteen years old and in the seventh grade. She identified Pate in the courtroom and stated that he "was my mom's boyfriend" and that he had once lived in the trailer with the Watsons. On the night J.W.'s father died, Pate was not living at the trailer and J.W.'s mother and grandmother were not present because they were in jail. J.W. stated that, at some point that night, she wanted to leave the trailer to get medicine from her grandmother's house next door. She opened the front door to the trailer and saw "five or six" men, one of whom had a bat and one of whom had a gun with "a little wheel on it ... like the western kind." The gunman pushed her into her room with her younger sister, M.W., and closed the door. After a while, the girls emerged from the room, saw that no one remained in the trailer, and M.W. called the police. J.W. exited the trailer and saw her father lying injured in the back of a neighbor's house. After the police arrived, J.W. and M.W. went to another neighbor's house and spent the night there.

J.W. stated that, "a few months" before her father died, Pate "was out, like, around the porch of my grandma's house and then he said, 'I'm going to bury your dad six feet under.' . . . And he said about my grandma, 'I have a bullet with her name ready on it.'"

\* \* \*

H. M.W.

M.W. testified that she is eleven years old and in the sixth grade. Like her sister, M.W. identified Pate in the courtroom and stated that he had lived with the family "for about a year" previously, but not on the day her father was shot. At one point "a few weeks before this happened to my dad," Pate "said he was going to bury my dad six feet under." Pate also "said that he was going to get Ace and all his buddies and come hurt my dad." According to M.W., Pate once "brought his buddies from the Aryan Circle [to the trailer] ... they were going to hurt some guy named J.R .... [bec]ause he was messing with my mom." On the night of January 4, 2008, "about five" of the men, one of whom had a gun, "shoved their way in" to the trailer as J.W. was opening the front door. One of the men pushed the girls into a room and shut the door. When M.W. heard the men leave, she went to her grandmother's house to call the police. After calling the police, she went looking for her father; she found him lying down in the neighbors' yard "moaning." When asked whether she had heard any gunshots that evening, M.W. replied: "Yes.... Once me and my sister were in our room, we went outside and then that's when we heard the gunshot." She did not see who fired the shot. She stated that the man she picked out from Investigator Brooks's photo array was one of the men who entered her house that evening.

\* \* \*

I. Justin Padgett

Padgett testified that he is currently incarcerated for possession of methamphetamine and that he "[u]sed to" be associated with the Aryan Circle. He stated that he knew Pate and Aaron and that Aaron stayed with him at his house "a half a week or a week prior to his death." On the night of January 3, 2008, Pate arrived at Padgett's trailer with another man seeking to purchase "some dope or some pills." According to Padgett:

> [Pate] questioned me where Aaron Watson was. I
> told him Aaron wasn't staying there.... Also asked

> me if I knew where maybe any places he could be
> at. I told him no I didn't. Asked him what the deal
> was. He told me that he was looking for him. He
> was going to handle up on him, handle some
> business with him.... He asked me if I'd ride with
> him to go handle, you know, to go talk to him,
> handle up some business, and I told him no, I was
> busy.

Padgett denied that he was at the Watsons' trailer on the night in
question, and he denied having any involvement with Aaron's
murder.

* * *

K. Suni Lee

Suni Lee testified that, on January 3, 2008, she was employed at a
liquor store in Rockport, Texas. She stated that she was acquainted
with the Watsons and their children. At some time after 3:00 p.m.
on that day, Pate entered the store and purchased a beer and a pack
of cigarettes. While he was there,

> [Pate] said that he had just gotten out of jail and it
> was because him and Tracy—Aaron and Tracy and
> Chad apparently had an altercation of some sort and
> that was why he went to jail. And then he said that
> he had something for that Aaron. It was basically all
> he said to me.

L. Tracy Watson

Tracy stated that she and Aaron were married in 1998 and were
still married at the time of Aaron's death. She knew Pate because
he and Aaron were best friends. In 2007, Pate came to Fulton and
Aaron allowed Pate to stay with the family in their trailer. At some
point, Tracy and Aaron separated; within a couple of weeks
thereafter, Pate and Tracy "became intimately involved." Aaron
came back to the trailer "[e]very weekend" to visit his daughters,
and initially, he and Pate "still talked and they got along okay." At
some point, however, the relationship between Aaron and Pate
changed. According to Tracy:

> Probably about three or four months after me and
> Pate had been together, things started getting ... I
> don't know. Pate would get mad whenever Aaron

would come over because I think that Pate felt threatened that Aaron was trying to get back with me, which he was. He wanted me back and I wasn't ready to go back with him yet 'cause he didn't want to settle down and stay home. He just wanted to run the streets.

Tracy also stated that, "a few months before" her husband's death, Pate "[s]aid he was going to kill [Aaron] ... [and] that he was going to have his arms and legs broken."

According to Tracy, Pate was arrested on December 26, 2007 "in reference to a female's stolen purse." Aaron then moved back into the trailer. Tracy testified that, when Pate was released from jail on January 3, 2008, "Aaron and I were on our way to the sheriff's department to get a criminal trespassing warrant put against [Pate] so that problems wouldn't start." When they arrived at the sheriff's office, "[t]hey said they had a warrant for me for theft and they put me in jail. And then a couple of days later, the charges were dropped. They said that it was a misidentification."

Tracy further stated that in November of 2007, a man by the name of J.R. knocked on the door of the Watsons' trailer, looking for Pate. Tracy responded that she didn't know where Pate was, but "J.R. didn't want to leave. He tried taking my clothes off and trying to get me to have sex with him and stuff. And I told him 'no.' I told him to get out and leave, and he finally left." When Tracy told Pate about what J.R. did, Pate "was angry.... And then a few days later, about a couple of weeks later, three people came to my property to see [Pate].... Pate said they were there to beat J.R. up." The three men were introduced to Tracy as "Underwood, Ziggy and Spooky."

*Pate v. State,* 13-09-0112-CR, 2010 WL 3921177, at 1 -8  (Tex.App.-Corpus Christi, Oct. 7, 2010) (some footnotes omitted).

The 13th Court of Appeals affirmed the conviction and sentence, *Pate v. State,* No. 13-09-0112-CR, 2010 WL 3921177, at 1 -8  (Tex.App.-Corpus Christi, Oct. 7, 2010).  The Texas Court of Criminal Appeals ("TCCA") refused Pate's petition for discretionary review on May 25, 2011.  *Pate v. State*, PDR No. 1504-10 (Tex. Crim. App., May 25, 2011).

Pate filed an application for a state writ of habeas corpus. The TCCA denied relief. *Ex Parte Pate*, No.78,165-01 (Tex. Crim. App. March 6, 2013). He filed this federal petition on March 12, 2013.

II.     The Standard for Summary Judgment in Habeas Corpus Cases

"As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases." *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000). In ordinary civil cases a district court considering a motion for summary judgment is required to construe the facts in the case in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). Where, however, a state prisoner's factual allegations have been resolved against him by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness established by 28 U.S.C. § 2254(e)(1) should not apply, it is inappropriate for the facts of a case to be resolved in the petitioner's favor. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981). In reviewing factual determinations of the Texas state courts, this court is bound by such findings unless an exception to 28 U.S.C. § 2254 is shown.

III.    Analysis

Pate's petition raises 16 claims for relief. These are addressed in turn.

A.      Severance

In his first two claims, Pate contends that the judge handling pre-trial matters granted Pate's motion to sever his trial from Hall's, but they were nonetheless tried together. Based on this, Pate argues that his conviction is void because the trial court lacked jurisdiction to conduct

his trial, and that his conviction violates due process. The record shows, however, that no severance was ever granted.

In connection with Pate's state habeas corpus proceeding, the judge who signed the severance order explained that the order was signed in error. As a result, it was never entered. SH at 86. The judge explained that he actually granted a motion for a continuance, but that the wrong motion was placed in front of him for signature. The error was discovered before the order was filed, and the order was therefore never filed. Pate's first two claims are thus based on an erroneous factual premise. Moreover, he fails to cite any legal authority for his claim that the severance order would have deprived the trial court of jurisdiction. He is not entitled to relief on these claims.

     B.    <u>Ineffective Assistance of Counsel</u>

In his third and twelfth claims for relief, Pate contends that he received ineffective assistance of counsel. To prevail on a claim for ineffective assistance of counsel, Petitioner

> must show that . . . counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the *Strickland* test, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances. *Id.* at 688. Review of counsel's performance is deferential. *Id.* at 689.

1.      Failure to Sever

In his third claim for relief, Pate contends that counsel was ineffective for failing to sever Pate's trial from his co-defendant's.  Petitioner concedes that "counsel repeatedly moved for a severance . . .," Pet. at 8, but was unsuccessful in obtaining one.  Pate does not identify anything else that counsel could or should have done to obtain the severance.  Pate thus fails to demonstrate deficient performance by counsel.

2.      Failure to Investigate

In his twelfth claim, Pate contends that counsel failed to investigate and discover alibi and character witnesses, and DNA evidence.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation."  *Wiggins v. Smith*, 539 U.S.510, 521 (2003) (internal quotation marks and alteration omitted) (quoting *Strickland*, 668 U.S. at 690-91).   When assessing the reasonableness of an attorney's investigation, a court must "consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further."  *Id.* at 527.   To establish that an attorney was ineffective for failure to investigate, a petitioner must allege with specificity what the investigation would have revealed and how it would have changed the outcome of the trial.  *See United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).

a.      Uncalled Witnesses

The Fifth Circuit has held that "complaints based upon uncalled witnesses [are] not favored because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain, and . . . speculations as to what these witnesses would have testified is too uncertain."  *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir. 1985) (citing *United States v.*

*Cockrell*, 720 F.2d 1423, 1427 (5th Cir. 1983), *cert. denied*, 467 U.S. 1251 (1984)).   "In order

for the appellant to demonstrate the requisite *Strickland* prejudice, the appellant must show not

only that this testimony would have been favorable, but also that the witness would have testified

at trial."  *Id.*

Pate makes only conclusory allegations that counsel failed to discover helpful witnesses.

He does not identify any such witnesses, or explain what testimony they could have given.

On a claim of ineffective assistance of counsel, review of counsel's performance must be

highly deferential.   *Strickland*, 466 U.S. at 689.   Because Pate fails to identify any helpful

witnesses who counsel failed to call, let alone whether such witnesses were available to testify or

the substance of their testimony, he fails to demonstrate deficient performance by counsel

b. <u>DNA</u>

Pate's allegations concerning DNA evidence are similarly conclusory.  While he asserts

that an unknown person's DNA was found underneath the victim's fingernails, he directs the

Court to no such evidence, nor does he explain how such evidence would disprove his

involvement in the murder.  He thus fails to demonstrate that counsel failed to discover any DNA

evidence, or any *Strickland* prejudice.

C.     <u>Use of Leg Restraints During Trial</u>

In his fourth and fifth claims for relief, Pate contends that he was denied due process

when he was compelled to wear leg restraints during his trial.  Respondent answers that Pate's

restraint, which was apparently a brace, not shackles, *see* 8 Tr. at 50, was not plainly visible.  In

support of this argument, he points to the fact that counsel stated, outside the presence of the

jury, that Pate's leg brace needed adjustment.  He also points to an objection by counsel to a

comment about the leg brace made by someone in the audience.  The objection was based on the

fact that the comment was made near the jury.  Respondent surmises from this that the only reason this was important is because the jury was otherwise unaware that Pate was wearing the restraint.  There is no evidence that any juror heard the comment.  *See Id.*; 6 Tr. at 259.  In his response to Respondent's motion for summary judgment, Pate does not dispute Respondent's assertions that the leg brace he wore was not visible to the jury, nor does he cite any evidence that the jury heard the comment by the spectator.

"We begin with the threshold premise than an accused is presumed innocent and, as such, is entitled to all of the trappings of innocence during trial.  *United States v. Nicholson*, 846 F.2d 277, 279 (5th Cir. 1988) (citations omitted).  Thus, the shackling of a defendant during trial, a practice that potentially threatens the defendant's presumption of innocence, bears close scrutiny.  *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 1345 (1986) (citing *Estelle v. Williams*, 425 U.S. 501, 503-04, 96 S. Ct. 1691, 1692-93 (1976)); *Marquez v. Collins*, 11 F.3d 1241, 1244 (5th Cir. 1994) ("Restraint at trial may carry a message that a defendant continues to be dangerous.")

These important due process concerns must be balanced against the court's obligation to protect the court and its processes, and to attend to the safety and security of those in the courtroom.  *Nicholson*, 846 F.2d at 279 (citations omitted); *Marquez*, 11 F.3d at 1244.  While a defendant is entitled to the physical indicia of innocence, a court is justified in ordering him handcuffed and shackled during trial [when] there is a danger of escape or injury to the jury, counsel, or other trial participants.  *Wilkerson v. Whitley*, 16 F.3d 64, 67 (5th Cir. 1994); *See also, Chavez v. Cockrell*, 310 F.3d 805, 809 (5th Cir. 2002) (use of stun-belt was not abuse of discretion where defendant was a flight risk); *Marquez*, 11 F.3d at 1244 (court has discretion in determining whether restraints are needed to ensure safety of trial participants or sanctity of trial).  The trial court's mitigation of any potential prejudicial effect on the jury amplifies the

reasonableness of the decision.  *See Chavez*, 310 F.3d at 8.  Most importantly, this inquiry does not trigger a type of "least restrictive means" analysis.  That in retrospect some lesser restraint might have sufficed is not determinative.  *Marquez*, 11 F.3d at 1244.

Even if the use of restraints violated Pate's right to due process, he is not entitled to relief unless the error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (internal quotation marks omitted).  Unlike the defendants in some of the cases cited above, it appears that Pate was not visibly shackled, but wore a leg brace under his clothing.  While Pate argues that there is no evidence that restraint was necessary, he also fails to demonstrate that the jury was aware of his restraint, or that it in any way impacted the fairness of his trial.

The evidence of Pate's guilt included Pate's history with the victim, and numerous witness statements implicating Pate.  The evidence, coupled with the lack of any evidence that the jury was aware of the restraint, necessarily leads to the conclusion that the restraint had no appreciable effect on the outcome of the trial.  Therefore, even if it was error to require Pate to wear the leg brace, any such error was harmless.

   D.   Actual Innocence

In his Sixth claim for relief, Pate argues that newly discovered evidence shows that he is actually innocent of the crime.  "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera v. Collins*, 506 U.S. 390, 400 (1993).   This is so because "federal habeas courts sit to ensure that individuals are not imprisoned in violation of the Constitution – not to correct errors of fact." *Id.* Thus, Pate's claim of actual innocence is not cognizable on federal habeas corpus review.

E.      *Brady* Claims

In his seventh through eleventh claims for relief, Pate contends that his rights were violated under *Brady v. Maryland*, 373 U.S. 83 (1963) because the State failed to disclose exculpatory evidence.   In his seventh claim, Pate claims that the State failed to disclose that his DNA and fingerprints were not found at the crime scene, that an unknown person's DNA was found under the victim's fingernails, that the DNA of one of the accomplices was not tested, and that DNA tests were not run on all of the evidence in recovered from the crime scene.   In his eighth through eleventh claims, he contends that the State failed to disclose plea deals with witnesses Michael Underwood, Kevin Tanton, and Anthony Ray.

Respondent notes that the State never argued that Pate's DNA was found at the scene, that Ray's DNA was tested, or that every piece of evidence recovered from the crime scene was tested.   In fact, testimony showed that Pate remained outside the trailer during the murder, so it is not surprising that his DNA and fingerprints were not recovered from the trailer.   Respondent further notes that Pate argued at closing that the only DNA recovered from the scene was the victim's.   *See* 8 Tr. at 186.   With regard to the plea deals, trial testimony made it clear that each of the witnesses had entered into an agreement that their sentences would be capped at 15 years. *See* 7 Tr. at 8-9, 111-12, 211-12.

A prosecutor must disclose evidence favorable to an accused if it "is of sufficient significance to result in the denial of the defendant's right to a fair trial."   *United States v. Agurs*, 427 U.S. 97, 108 (1976).   Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985).     The question is not whether the result

would have been different.  Rather, it is whether given the non-disclosures of material evidence the verdict is less worthy of confidence.

The record reveals that the information about the plea deals was in evidence.  Moreover, Pate fails to show that the information about the lack of DNA and fingerprint evidence, and lack of testing, was in any way material.  DNA evidence was not an issue in this case.  The State presented evidence that Pate remained outside the trailer during the murder.  There was no evidence that he had physical contact with the victim.  Pate fails to show how the negative facts that he claims were not disclosed could have helped him in any way.  Pate is not entitled to relief on claims seven through eleven.

### F.     Prosecutorial Misconduct

In his thirteenth and sixteenth claims for relief, Pate claims that the prosecution engaged in misconduct by suborning perjury and failing to correct perjured testimony.  He also alleges prosecutorial misconduct based on the *Brady* claims rejected above.

The knowing use of perjured testimony by the state violates a defendant's right to due process of law.  *See Giglio v. United States*, 405 U.S. 150, 153-54 (1972); *Knox v. Johnson*, 224 F.3d 470, 477 (5th Cir. 2000), *cert. denied*, 532 U.S. 975 (2001).  The Fifth Circuit has explained, however, that

> [t]o establish a due process violation based on the State's knowing use of false or misleading evidence, [a habeas petitioner] must show (1) the evidence was false, (2) the evidence was material, and (3) the prosecution knew that the evidence was false.  Evidence is false if, *inter alia,* it is specific misleading evidence important to the prosecution's case in chief.  False evidence is material only if there is any reasonable likelihood that [it] could have affected the jury's verdict.

*Nobles v. Johnson*, 127 F.3d 409, 415 (5th Cir. 1997) (internal citations and quotation marks omitted, third alteration in original), *cert. denied*, 523 U.S. 1139 (1998).  "We do not . . .

automatically require a new trial whenever 'a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict. . . .' A finding of materiality of the evidence is required under *Brady*."   *Giglio*, 405 U.S. at 154. When the question of materiality arises, "a new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" *Id.*

In this case, however, Pate merely makes conclusory allegations that the testimony of Anthony Ray, Michael Underwood, Kevin Tanton, Jennifer Leyva, and Tracy Watson was false. He offers no evidence to support this claim.   Conclusory allegations are not sufficient to merit habeas corpus relief.  *See*, *e.g.*, *Day v. Quarterman*, 566 F.3d 527, 540 (5th Cir. 2009).   Because Pate fails to demonstrate that any of the testimony was false or, as discussed above, that there was a *Brady* violation, his claims of prosecutorial misconduct fail.

G.     Due Process

In his fourteenth and fifteenth claims, Pate contends that he was denied due process because the jury was improperly instructed on parole eligibility, and because the jury improperly relied on the foreman's notes.  Pate provides no admissible evidence in support of these claims.

In connection with his state habeas corpus proceeding, Pate provided an affidavit by an investigator.   That affidavit conveyed some statements by one of the jurors.   SH at 80-84. Respondent correctly points out that the statements in the affidavit are inadmissible hearsay.  *See* Fed. R. Evid. 801(c).  Respondent also points out that the subject matter of the statement, *i.e.*, the jury's deliberative process, is not a permissible subject for post-trial juror testimony.  *See* Fed. R. Evid. 606(b)(1).  Accordingly, Pate presents no competent evidence to support his claim that the jury considered improper material.

IV.   Conclusion

For the foregoing reasons, Pate fails to raise a viable claim for habeas relief.  His petition must be dismissed with prejudice for the reasons stated in this opinion.

V.   Certificate of Appealability

Pate has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone."  *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further."  *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

This Court has carefully considered Pate's claims.  The Court finds that the claims are foreclosed by clear, binding precedent.  This Court concludes that under such precedents, Pate has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This Court concludes that Pate is not entitled to a certificate of appealability on his claims.

VI.  Order

For the foregoing reasons, it is ORDERED as follows:

A.  Respondent's Motion for Summary Judgment (Doc. # 11) is GRANTED;

B.  Petitioner Chadrick B. Pate's Cross-Motion for Summary Judgment (Doc. #16) is DENIED;

C.  Pate's Petition for Writ of Habeas Corpus (Doc. # 1) is in all respects DENIED; and

D.  No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

SIGNED on this 20th day of March, 2014.

_____
Kenneth M. Hoyt
United States District Judge